IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

JULIE POGUE,                              )
                                          )
                    Plaintiff,            )
                                          )
         v.                               )      Case No.
                                          )      13-4216-CV-C-REL-SSA
CAROLYN W. COLVIN, Acting                 )
Commissioner of Social Security,          )
                                          )
                    Defendant.            )

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Julie Pogue seeks review of the final decision of the Commissioner of Social

Security denying plaintiff's application for disability benefits under Title XVI of the Social

Security Act ("the Act").  Plaintiff argues that the ALJ erred in assessing plaintiff's residual

functional capacity in that the ALJ improperly weighed the medical opinions.  I find that the

substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not

disabled.  Therefore, plaintiff's motion for summary judgment will be denied and the decision

of the Commissioner will be affirmed.

## I.    BACKGROUND

On September 3, 2010, plaintiff applied for disability benefits alleging that she had

been disabled since August 1, 2008.  Plaintiff's disability stems from schizophrenia and

depression.  Plaintiff's application was denied on November 29, 2010.  On May 1, 2012, a

hearing was held before an Administrative Law Judge.  On July 2, 2012, the ALJ found that

plaintiff was not under a "disability" as defined in the Act because she retained the residual

functional capacity to perform her past work as a janitor despite her impairments.  On June

26, 2013, the Appeals Council granted plaintiff's request for review, and on August 27, 2013,

the Appeals Council issued a new decision.  The Appeals Council adopted the ALJ's findings;

however, because plaintiff had not performed her past work as a janitor at the substantial

gainful activity level, the Appeals Council found that plaintiff had no past relevant work but that she could perform the representative unskilled jobs identified by the vocational expert during the administrative hearing in response to a hypothetical question reflecting plaintiff's age, education, work experience and residual functional capacity. Therefore, the opinion of the Appeals Council stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative

2

decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

        Yes = not disabled.
        No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

        No = not disabled.
        Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

        Yes = disabled.
        No = go to next step.

Case 2:13-cv-04216-REL   Document 19   Filed 11/06/14   Page 3 of 35

4. Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

5. Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV. THE RECORD

The record consists of the testimony of plaintiff and vocational expert Dr. John McGowan, in addition to documentary evidence admitted at the hearing.

### A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

The record establishes that plaintiff earned the following income from 2003 through 2011:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 2003 | $ 881.64 | 2008 | $ 1,186.69 |
| 2004 | 5,408.50 | 2009 | 0.00 |
| 2005 | 119.34 | 2010 | 0.00 |
| 2006 | 2,213.70 | 2011 | 0.00 |
| 2007 | 76.50 | | |

(Tr. at 128-133).

**Disability Report - Field Office**

On September 15, 2010, plaintiff met face to face with A. Meuir of Disability Determinations (Tr. at 134-136). Plaintiff was observed to have no difficulty with reading,

4

understanding, coherency, concentrating, talking, answering, sitting, standing, walking, seeing, using her hands or writing (Tr. at 135).

> Neatly dressed. Answered all questions appropriately. She had no problems understanding. No physical limitations noticed. She was not in pain. She did not complain of any difficulties. She asked questions relating to the interview. She read the material given to her. Nothing unusual observed.

## Function Report - Adult

On September 24, 2010, plaintiff completed a Function Report (Tr. at 146-153). She reported that she does "everything" for her children, "cook, clean, bathing, etc." Plaintiff had no difficulty with personal care but claimed that her hair had fallen out and that some days she does not eat because of stress. She was able to clean her home and do laundry. She reported going out of her home a couple times a week either walking or using public transportation. She shopped in stores for food and other household items for 40 to 50 minutes at a time. She is able to pay bills, handle bank accounts and count change. She attended church services every other weekend. She does not need someone to accompany her when she goes places.

Plaintiff reported that she does not have patience to deal with family or others for very long and she gets "this angry feeling" when too many people come around. Her condition affects her ability to lift, bend, walk, remember, complete tasks, concentrate, and get along with others. Her condition does not affect her ability to squat, stand, reach, sit, kneel, talk, hear, climb stairs, see, understand, follow instructions or use her hands. She follows written instructions OK; she follows oral instructions "good." She gets along well with authority figures. She has never been fired from a job because of problems getting along with other people. Stress causes her to cry, sleep and skip eating some days.

## B.     SUMMARY OF TESTIMONY

During the May 1, 2012 hearing, plaintiff testified; and Dr. John McGowan, a vocational expert, testified at the request of the ALJ.

1.   **Plaintiff's testimony.**

At the time of the hearing, plaintiff was 27 years of age (Tr. at 31). She filed her application for disability benefits on September 3, 2010 (Tr. at 31). When asked whether something happened to her around that time to make her believe she was disabled, plaintiff said, "No, I, I wouldn't say that I remember a specific incident. I was kind of having a crisis within my life." (Tr. at 31). The crisis was that plaintiff was new to Columbia, she was a single mother with two kids and she did not know how she was going to get from day to day (Tr. at 31).

Plaintiff was 5'2" tall and weighed 177 pounds (Tr. at 32). She was single and had two children, ages 4 and 3 (Tr. at 32). Plaintiff lived alone in an apartment with her children (Tr. at 33). Although her children are not disabled, she had taken her son to the autistic center on two different occasions (Tr. at 33). She was living off $292 in TANF and $526 in food stamps per month (Tr. at 33). She was living in a rent-assistance apartment through HUD (Tr. at 34).

Plaintiff had not previously had a driver's license, but she was at the time learning how to drive (Tr. at 34). Plaintiff would go out of her home two to three times a week riding with someone else (Tr. at 34-35). She walked to her most recent job at Stephen's College (Tr. at 35). It took her 20 to 25 minutes to walk to work (Tr. at 35). A friend gave her a ride to the administrative hearing (Tr. at 35).

Plaintiff has a high school education and some college (Tr. at 36). Plaintiff had an IEP from 4th through 6th or 7th grade (Tr. at 36). She was never held back a grade in school; she can read and write; and she took courses at the St. Louis Job Corps for retail sales (Tr. at 36). Since her alleged onset date, plaintiff worked as a janitor and in maintenance at Stephens College (Tr. at 36). She testified that she worked 40 hours per week for 2 1/2 months in 2011 (Tr. at 37, 38). When asked why she left that job, she testified that she was getting dizzy and

6

blacking out from migraine headaches (Tr. at 37). Plaintiff also worked at the Hampton Inn as a housekeeper (Tr. at 37). She testified that she was supposed to work for 40 hours a week, but she was new to the job and "never met that requirement." (Tr. at 37). She worked from 20 to 25 hours per week earning $7.50 per hour (Tr. at 37). She worked there from April 13 to April 24 of 2012, one week before the administrative hearing (Tr. at 37). On her day off, she woke up with an "enormously big" foot and went to the emergency room (Tr. at 38). She was diagnosed with gout, so she has not worked since then (Tr. at 38). In 2004 plaintiff worked as a school age daycare teacher (Tr. at 39). This was a part-time job while she was still in school (Tr. at 39).

Plaintiff was asked to explain why she cannot work:

What I believe keeps me from working full-time is my post-traumatic stress disorder. Being bipolar, as well. I have good and bad days. My temperament and mood swings, I can't quite explain. I have a lot of stress and traumatic issues from my past that don't allow me to push forward like I would like to at times.

(Tr. at 40).

Plaintiff testified that her gout is "definitely an issue" now (Tr. at 41). When plaintiff was working at the college, she felt she was having periods where she knew a "blow up" was coming, but she never blew up (Tr. at 41).

Plaintiff has medical insurance through DFS (Tr. at 41). She has a co-pay of 50 cents on medication and no co-pay for doctor visits (Tr. at 42). Plaintiff sees Peggy Brothers once a month -- although plaintiff testified that Ms. Brothers is a psychiatrist, the medical records establish that she is a nurse practitioner (Tr. at 42). Plaintiff has therapy sessions with Ms. Brothers and she gets her medication from her as well (Tr. at 42-43). The sessions are about 30 minutes long (Tr. at 43). In the past she was having a good period when she only saw a caseworker and did not need to see a doctor (Tr. at 54). Plaintiff resumed seeing Ms. Brothers in March -- about a month or two before the administrative hearing (Tr. at 55). In the past

plaintiff has had trouble getting to doctor appointments due to having no transportation, no money for the bus, sometimes no child care (Tr. at 55). Plaintiff's caseworker came to plaintiff's home (Tr. at 55).

Since her alleged onset date, plaintiff went to the hospital a couple times because of headaches (Tr. at 45). She also slipped and fell, and she went to the emergency room when she was diagnosed with gout (Tr. at 45). At one point plaintiff was on a medication she had to inject herself, but it made her black out so she no longer uses it (Tr. at 45). Plaintiff's medications help her conditions somewhat, but "my being bipolar overrules a lot of things. I'm this person; I'm that person. My temperament's this way; it's that way." (Tr. at 46). When plaintiff is at home, she feels like her medications work (Tr. at 46). When she is in a large group "or even my place of business" there is too much going on at one time and she does not feel like her medications work then (Tr. at 46).

Plaintiff does not smoke (Tr. at 46). She drinks, but not often -- usually only when she goes to a party (Tr. at 46).

Plaintiff's foot swells up three to four times a day due to gout (Tr. at 47). Plaintiff does not wear shoes unless she is taking her children to day care (Tr. at 48, 51). When asked how she takes her kids to day care since she does not drive, plaintiff testified that she had been walking her kids to day care but since she was diagnosed with gout, a friend has been taking them (Tr. at 49). "I have crutches and my armpits are raw, so I didn't bring them today." (Tr. at 49).

She had been having migraine headaches three to four times a week, but now she has them three or four times per month (Tr. at 48). Her migraines last from two to three days (Tr. at 48). Plaintiff takes Ibuprofen and Maxalt, and she lies down in a dark room and tries to sleep it off (Tr. at 49).

8

Although plaintiff testified she has trouble sleeping at night, she said she gets at least eight hours of sleep each night (Tr. at 50). Later in the hearing, plaintiff's attorney asked her how many hours of sleep she gets on nights when her mind is racing, and she said "sometimes anywhere from two to four." (Tr. at 56). Prior to being diagnosed with gout, plaintiff was able to care for herself (Tr. at 50). Now that she has gout, she has to have a friend come over to hold her up while she showers (Tr. at 50). Plaintiff does not feed her kids breakfast because they eat at day care (Tr. at 51). On the weekends when her kids are home, plaintiff has to cook and clean as usual (Tr. at 51). Plaintiff gets a lot of help with her children -- she calls her aunt and says she is about to have a nervous breakdown and asks her aunt to come get the children (Tr. at 51). Plaintiff believes that if she is unable to care for her children, she would be unable to work (Tr. at 59). Plaintiff serves fast food and pizza when she doesn't cook, or sometimes her aunt will bring food over (Tr. at 51). Plaintiff does the housecleaning and the laundry (Tr. at 51). She has a washer in her home but the dryer is across the street or she hangs the clothes on a clothes line (Tr. at 52). Plaintiff does the grocery shopping (Tr. at 52). Plaintiff visits with her aunt and her neighbors but she does not put herself in a position to be around a lot of people (Tr. at 53).

Plaintiff used to attend church but no longer does (Tr. at 53). She likes to read and play games with her kids (Tr. at 53). During the day when her kids are at day care, plaintiff tries to do whatever chores around the house she needs to do, she takes care of business calls or attends doctor appointments or "school appointments" for her kids (Tr. at 53).

2.     **Vocational expert testimony.**

Vocational expert Dr. John McGowan testified at the request of the Administrative Law Judge. The first hypothetical involved a person able to work at all exertional levels and who could understand, remember and carry out complex instructions; relate appropriately with

coworkers and supervisors; deal with usual changes common to a competitive work environment; and use judgment to make simple work-related decisions (Tr. at 61). Such a person could work as a janitor, DOT 382.664-010, medium, semi-skilled (Tr. at 63).

The second hypothetical involved a person who could perform light work; understand, remember and carry out simple instructions; relate appropriately with coworkers and supervisors; deal with the usual changes common to a competitive work environment; and use judgment to make simple work-related decisions (Tr. at 63). Such a person could work as a housekeeper, DOT 323.687-014, light, unskilled, with 31,175 jobs in Missouri and 1,100,000 in the country (Tr. at 64). The person could work as a production assembler, DOT 706.687-010, light, unskilled; and this position does not require dealing with people. There are 8,600 such jobs in Missouri and 345,000 in the country (Tr. at 64). The person could work as a hospital products assembler, DOT 712.687-010, light, unskilled, with 1,500 in Missouri and 26,400 in the country (Tr. at 65).

The third hypothetical involved a person who is seriously limited but not precluded from following work rules, using judgment, and functioning independently; and who has poor to no ability to relate to coworkers, deal with the public, interact with supervisors, deal with work stresses, maintain attention and concentration, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. The person has a fair ability to understand, remember and carry out simple instructions and maintain personal appearance (Tr. at 65). Such a person could not work (Tr. at 66). "[T]he public one, we, we could get around that. But the others on the stress, not being able, not being able to act stable and so one, those, Your Honor, if you had none on that, they, they simply couldn't work. They'd be such a disturbance in the workplace that they'd end up letting them go." (Tr. at 66).

10

The final hypothetical involved a person who would not be able to go to work three to six times a month or would have to leave work early due to his symptoms (Tr. at 67). The vocational expert testified that such a person would likely be fired for missing work or leaving (Tr. at 67).

## C.    SUMMARY OF MEDICAL RECORDS

On June 21, 2010, plaintiff saw Denise Barba, M.D., to establish care (Tr. at 210-213). Plaintiff reported having a migraine headache, and she said her migraines usually occur three times a week and last for one to two days. Ibuprofen 800 mg usually relieves it. Plaintiff's physical exam was normal. Her psychiatric exam was normal: "Alert and oriented. No unusual anxiety or evidence of depression." Plaintiff wanted to be put on birth control and was started on Depo-Provera.[1] She was given prescriptions for Imitrex[2] and Topamax[3] for migraine headaches.

On June 25, 2010, plaintiff saw Dr. Barba for a condition unrelated to her alleged disability (Tr. at 207-209). There was no mention of mental symptoms.

On June 29, 2010, plaintiff saw Dr. Barba for a condition unrelated to her alleged disability (Tr. at 204-206). There was no mention of mental symptoms.

On July 19, 2010, plaintiff saw Dr. Barba complaining of a migraine headache and depression (Tr. at 200-203). Plaintiff reported that it was "somewhat difficult to meet home, work, or social obligations." Plaintiff reported experiencing diminished interest or pleasure, fatigue or loss of energy, feelings of guilt or worthlessness, poor concentration, indecisiveness, restlessness or sluggishness, significant change in appetite (weight loss or gain greater than

_____

[1]Depo-Provera shots are administered every 12 weeks to prevent pregnancy.

[2]Imitrex treats migraine headaches; it does not prevent migraine headaches.

[3]Topamax is an anticonvulsant used to prevent migraine headaches.

11

5%), sleep disturbance and thoughts of death or suicide. She denied anxiety, fearful thoughts, depressed mood. "Has not been on meds for a while." Plaintiff reported that she had been taking Topamax and Imitrex and was still having headaches three times a week, worse since restarting depo. Plaintiff's physical exam was normal. Her psychiatric exam was normal: "The patient is oriented to time, place, person, and situation. The patient's affect is normal. The patient is not anxious, and does not have suicidal ideation." No abnormal psychiatric findings were noted. Plaintiff was told that Depo can decrease the effectiveness of Topamax and Dr. Barba discussed other forms of birth control with her. She was started on Celexa (anti-depressant) and counseling was recommended.

On July 27, 2010, plaintiff saw Denise Barba, M.D., for a condition unrelated to her alleged disability (Tr. at 196-199). No mental symptoms were alleged or observed.

On August 27, 2010, plaintiff was seen by Kimberly Yeagle, a social worker, after having been referred by Parkade when plaintiff presented there for an assessment for the CPRC (Community Psychiatric Rehabilitation Center) program (Tr. at 178-180). "Ct reports history of mood swings, mainly angry and depressed. Ct is wanting to start a new life here with her children but is too emotionally unstable at this time to hold a job." Plaintiff reported snapping at her two young children but said she does not get physical with them. She reported having lashed out at her former boy friend when she was angry. Plaintiff reported having seen a therapist at the YWCA in St. Louis which was very helpful, but she was at that time receiving no treatment. She had no significant medical history to report. "Ct does not have anyone to leave her children with so all of her time is spent carrying [sic] for 2 very young children." The mental status exam reads in its entirety as follows: "clear, oriented x 3". She was assessed with post traumatic stress disorder, rule out bipolar disorder, rule out borderline traits, with a GAF of 54.

12

On August 31, 2010, plaintiff saw Dr. Barba complaining of a migraine headache for the past three days (Tr. at 192-195). Relieving factors included distraction and sleep. Plaintiff had stopped taking Topamax since her last visit. Plaintiff's physical exam was normal. "Alert and oriented. No unusual anxiety or evidence of depression." Plaintiff described her headache as her worst ever. She had taken only Tylenol and Aleve that day. She said she wanted to go to the emergency room for a CT scan. Plaintiff was given a shot of Toradol (non-steroidal anti-inflammatory). She was prescribed Maxalt[4] and Propranolol.[5]

On September 3, 2010, plaintiff applied for disability benefits.

On September 21, 2010, plaintiff was seen by Dr. Barba for a physical (Tr. at 187-191). Plaintiff denied chest pain, irregular heartbeat or palpitations, or shortness of breath. She reported back pain. "Mood changes, more irritable, stays at home and sleeps a lot, decreased energy, denies suicidal thoughts, decreased interest, on Celexa 20 mg daily." Her physical exam was normal including her back and spine. "No unusual anxiety or evidence of depression." Her Celexa was increased and she was told to follow up with a psychiatrist or with Dr. Barba in a month. She was told to exercise regularly (Tr. at 191).

On October 5, 2010, plaintiff was seen at Burrell Behavioral Health by Peggy Brothers, CNSBC (clinical nurse specialist - board certified), for an initial psychiatric evaluation (Tr. at 231-235). Her chief complaint was "depression, mood swings." Plaintiff claimed to have multiple personalities. Plaintiff reported having nightmares, irritability, and agitation; she denied suicidal or homicidal ideation. She said she had been depressed her entire life. Plaintiff reported being hypervigilent, having nightmares, not trusting anyone. She reported decreased energy, decreased motivation, decreased concentration, poor memory. Plaintiff reported abuse

---

[4]Maxalt treats but does not prevent migraine headaches.

[5]Propanolol is a beta blocker used to reduce the frequency of migraine headaches.

by her adoptive father but said her foster parents were "good." She denied a history of mania. She reported having panic attacks once or twice a week during which she would experience chest pain, shortness of breath, pounding heart, and shaky legs. She reported that her mother and a sister are schizophrenic. Plaintiff reported that she graduated from high school and has 14 college credit hours. She previously worked as a banquet server, cashier, and day care worker. The Mental Status Examination simply repeated all of plaintiff's allegations. Insight and judgment were fair, intellect "seems normal." Plaintiff had been taking Celexa, she said it worked in the past but she was not sure it was working anymore. Ms. Brothers recommended increasing her dose, but plaintiff was "hesitant" and said she would think about it. She was assessed with major depressive disorder, rule out panic disorder, post traumatic stress disorder, and a GAF of 48. Plaintiff eventually agreed to try an increased dose of Celexa but declined prescriptions for Abilify (antidepressant), Prazosin[6] for nightmares, and Trazodone (antidepressant) for sleep.

On October 8, 2010, plaintiff saw Elizabeth Brandon, a nurse practitioner in Dr. Barba's office, complaining of a sore throat (Tr. at 244-248). Her psychiatric exam was brief but normal: "The patient is oriented to time, place, person, and situation." She was assessed with upper respiratory infection and sinus infection.

On October 18, 2010, plaintiff saw Dr. Barba for a condition unrelated to her disability (Tr. at 249-252). No mental symptoms were alleged or observed. Plaintiff was given a flu shot.

---

[6]Adrenaline is a hormone that can make you feel stressed and have nightmares. Prazosin blocks some of the effects of adrenaline released in your body. This may help reduce the nightmares associated with post traumatic stress disorder.

On October 25, 2010, plaintiff saw Nurse Peggy Brothers at Burrell Behavioral Health (Tr. at 236-237). Plaintiff reported feeling worse since increasing her Celexa from 40 mg to 60 mg per day. She was not sleeping well, she was more irritable, she had less energy, and she was having tremors. Plaintiff thought that her speaking with her children's father four days earlier upset her -- they were abusive to each other in the past. Plaintiff denied psychotic symptoms. She denied suicidal and homicidal ideation. She reported trouble concentrating. Plaintiff was observed to have good grooming and hygiene. Her judgment and insight were fair, intellect was normal. The rest of her mental status exam repeated her subjective symptoms. Plaintiff's Celexa was decreased and Abilify was prescribed. She was told to return in two weeks.

On November 26, 2010, Mark Altomari, Ph.D., completed a Mental Residual Functional Capacity Assessment (Tr. at 214-216). He found that plaintiff was not significantly limited in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple instructions

- The ability to understand and remember detailed instructions

- The ability to carry out very short and simple instructions

- The ability to carry out detailed instructions

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to make simple work-related decisions

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to ask simple questions or request assistance

15

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to respond appropriately to changes in the work setting

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

He found that she was moderately limited in the following:

- The ability to maintain attention and concentration for extended periods

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to interact appropriately with the general public

On the same day Dr. Altomari completed a Psychiatric Review Technique finding that plaintiff has mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation (Tr. at 217-227). In support of his findings, Dr. Altomari wrote:

At the time of application the claimant alleged Depression and Schizophrenia.

MER [medical records] shows a history of depression substantially controlled on medication. On 8/27/10 PTSD [post traumatic stress disorder] was diagnosed at a one-time visit to Burrell.

ADL's [activities of daily living] reflect symptoms related [to] memory, concentration, task persistence, and getting along with others.

The claimant's allegations are partially credible. There is no evidence of schizophrenia, and MER does not reflect significant severity.

16

On January 25, 2011, plaintiff saw Dr. Barba for a condition unrelated to her disability (Tr. at 253-256). No mental symptoms were alleged or observed.

On February 10, 2011, plaintiff saw Beth Brandon, a nurse practitioner, for a condition unrelated to her disability (Tr. at 257). No mental symptoms were alleged or observed. Plaintiff declined a recommended test during this visit.

On February 17, 2011, plaintiff saw Nurse Peggy Brothers at Burrell Behavioral Health (Tr. at 239-240). Plaintiff reported having mood swings, feeling irritable, having angry outbursts, yelling at people. Overall she felt the Abilify was helping, she was sleeping better. "Feels overwhelmed with responsibilities; has a three-year-old daughter and a two-ear-old son. Gets frustrated with current situation." Ms. Brothers suggested increasing plaintiff's dose of Abilify but plaintiff declined saying she did not want to be on a lot of medications. "Feels like the medicines are working okay right now. Believes a lot of it is situational. Wants to continue same meds." Plaintiff was observed to have good grooming and hygiene. Her hair was "styled in a trendy way." Her mood was irritable. Her concentration was fair. Insight and judgment were fair. Intellect was normal. She was told to have blood work done and return in four weeks.

On March 1, 2011, Cheslea Brunstrom, a caseworker, picked up plaintiff and took her to a food pantry (Tr. at 289). She praised plaintiff for getting a second interview at New Horizon for a patient assistance position and encouraged her to follow up if she had not heard back soon. Plaintiff said her children's father had requested to keep the children over the summer, and plaintiff thought that would be a good idea so that she could have some personal time. Plaintiff said she had been in a pretty good mood lately and that her irritability had not been bad.

On March 3, 2011, Ms. Brunstrom picked up plaintiff and took her to a food pantry (Tr. at 290-291). Ms. Brunstrom inquired about plaintiff's job search, suggested the University of Missouri job site, suggested plaintiff use the library, suggested plaintiff go to the career center. Plaintiff said she had been in a pretty good mood and that her irritability had not been too bad. Plaintiff said she had applied at Columbia College for a janitorial position. Plaintiff said she could lose up to 25% of her temporary assistance money if she did not participate in the career center. Plaintiff spoke to someone about preventing this. "Lori Dryer . . . explained that because client was enrolled in BBH services she could be exempt from the career center requirements. She explained that she needed a written letter stating that client was unable to fulfill her career center requirements due to mental health issues."

On March 16, 2011, caseworker Chelsea Brunstrom picked up plaintiff to go to the library to do on-line job searching (Tr. at 292-293). Plaintiff requested that instead, they go to several area day cares so she could apply for a job and asked Ms. Brunstrom to take her to her lawyer's office. Plaintiff reported that she was "doing alright" and she talked about trying to be supportive to her sister who was going through a personal problem.

On March 17, 2011, Chelsea Brunstrom, a caseworker, took plaintiff to her lawyer's office to talk about her disability appeal (Tr. at 294-295). Plaintiff was doing "pretty good" but said she was a little anxious about seeing the lawyer.

On March 23, 2011, Chelsea Brunstrom, a caseworker, went to plaintiff's residence to take her to an interview at a day care (Tr. at 297). Plaintiff asked what working full time would do to her disability case. She was told to confer with her lawyer about that. Plaintiff reported having gotten into a fight with her cousin's girl friend over the weekend. She said the woman spit at her in order to initiate an altercation and plaintiff punched her in the face. This had all happened on a church outing. Plaintiff went to the interview and was offered a full-

18

time position. She said she wanted to take that position if her aunt would watch her kids, and she said she needed to contact her lawyer first to see if there would be any issues with working during the disability appeal process. Plaintiff asked to be taken to get a bus map and inquire about the bus routes, and then Ms. Brunstrom took plaintiff to a food pantry.

On March 30, 2011, Chelsea Brunstrom met with plaintiff and asked how her mood was doing (Tr. at 298-299). Plaintiff said that she had been doing "ok." She had not officially accepted the position at the day care. "When she informed them that she was taking the bus, they were not sure that it would work." The person at the day care told plaintiff that she would continue to interview for the job and would let plaintiff know if she was offered the position. Plaintiff said she was thinking about waiting for a different job that had more benefits.

On April 6, 2011, plaintiff called caseworker Chelsea Brunstrom and said she needed to be picked up at her aunt's (Tr. at 300-301). Ms. Brunstrom picked up plaintiff and took her to a food pantry. She praised plaintiff for attending vocational rehabilitation and scheduling transportation to an interview. Plaintiff said that she was "pretty good today, but I was wild yesterday." She had gotten frustrated with her mother and her son's father the day before.

On April 15, 2011, caseworker Chelsea Brunstrom visited plaintiff and observed that she seemed somewhat irritable with her children (Tr. at 302-303). Ms. Brunstrom encouraged plaintiff to continue with vocational therapy and job searching. Plaintiff stated that she was doing OK, she was getting things done, and she was still seeing her boy friend. Plaintiff talked about singing in her church choir and possibly going on a short trip out of town to sing at another church.

On April 18, 2011, caseworker Chelsea Brunstrom took plaintiff to an appointment at vocational rehabilitation (Tr. at 304-305). Plaintiff said she was doing OK, that she had

performed with her church choir over the weekend and was considering doing more solo performances. Plaintiff attended vocational rehabilitation and appeared eager to get into the workforce.

On April 20, 2011, plaintiff saw Dr. Barba and complained of abdominal pain (Tr. at 258-261). Plaintiff's physical exam was normal including no abdominal tenderness. She was told to use non-steroidal anti-inflammatories and a warm compress, but plaintiff said she wanted to be checked for ovarian cysts. She was referred for a pelvic ultrasound.

On April 21, 2011, caseworker Chelsea Brunstrom took plaintiff to an appointment at Job Point where she worked on her resume and job references (Tr. at 307-308). Plaintiff said she was doing alright and that she was excited about the Job Point appointment. Ms. Brunstrom took plaintiff to her appointment with Nurse Peggy Brothers at Burrell Behavioral Health (Tr. at 241-242, 309-310). "Reports mood has been pretty good for the most part. Has been busy and thinks that helps her mood. If she's not busy she states she gets depressed and irritable and picks at people verbally." Plaintiff complained about weight gain -- Dr. Barba believed it may be due to Depo-Provera or Abilify. Plaintiff reported feeling hungry all the time and eating a lot of sweets, drinking a lot of soda. "Discussed heart health diet, exercise. She states she does get a lot of exercise; she walks a lot." Plaintiff reported that the Abilify had been "very helpful for her mood." Plaintiff reported no problems with sleeping. She was observed to have good grooming and hygiene. Her hair was styled, she was wearing make up. Her concentration was fair, insight and judgment were fair, intellect was normal. The rest of the mental status exam repeated plaintiff's subjective description of her symptoms. Plaintiff had not gotten her blood work done. She was told to have her blood work done and return in four to eight weeks. After her appointment with Ms. Brothers, plaintiff was taken by Ms. Brunstrom to the library to check out a book.

On April 28, 2011, caseworker Chelsea Brunstrom took plaintiff to the Job Point job lab where she worked on her resume (Tr. at 311-312). Plaintiff said she was doing OK but that she had cried a lot the day before due to a negative situation her younger sister was in.

On April 29, 2011, caseworker Chelsea Brunstrom took plaintiff to a food pantry (Tr. at 313-314). Plaintiff said she was feeling good because her dad was going to babysit her children so that she could go out with friends to celebrate her birthday. She was also excited about attending a library event with her kids the next day.

On May 12, 2011, caseworker Chelsea Brunstrom spoke with plaintiff who said she was doing OK (Tr. at 315-316). She had submitted another job application but had not been to Job Point because she had gone to St. Louis to help her sister who was having a health issue.

On May 18, 2011, caseworker Chelsea Brunstrom took plaintiff to a food pantry, to obtain a bus pass, and to an appointment for plaintiff's daughter (Tr. at 317-318). Plaintiff reported that her mood had been OK but she had been concerned about her sister's situation.

On May 27, 2011, caseworker Chelsea Brunstrom visited plaintiff to help her with utilities assistance and in obtaining paperwork to try to get full custody of her children (Tr. at 319-320).

On May 31, 2011, plaintiff saw Diane Spalding, a nurse practitioner in Dr. Barba's office, for a condition unrelated to her alleged disability (Tr. at 262-265). During her exam, plaintiff denied chest pain, irregular heartbeat or palpitations. Her physical exam was normal.

On June 16, 2011, caseworker Chelsea Brunstrom took plaintiff to Job Point where she worked on applications to a grocery store and Wal-Mart (Tr. at 321-322).

On June 24, 2011, plaintiff saw Beth Brandon, a nurse practitioner in Dr. Barba's office, for a condition unrelated to her alleged disability (Tr. at 266-270). She had had an

abdominal ultrasound on April 22, 2011, which was normal (Tr. at 266). She denied fatigue, shortness of breath, back pain, bone or joint symptoms, muscle weakness and numbness in her extremities. Plaintiff's physical exam was normal except for abdominal tenderness. Her psychiatric exam was normal.

On June 30, 2011, plaintiff saw Beth Brandon, a nurse practitioner in Dr. Barba's office, for a condition unrelated to her alleged disability (Tr. at 272-274). Plaintiff denied chest pain, irregular heartbeat or palpitations, fatigue, back pain, bone or joint symptoms, muscle weakness, and numbness in her extremities. Her physical and psychiatric exams were normal.

On July 8, 2011, plaintiff saw Dr. Barba for heartburn (Tr. at 276-278). Her symptoms had resolved by the time of this appointment. Her physical exam was normal.

On July 22, 2011, caseworker Chelsea Brunstrom took plaintiff to a food pantry (Tr. at 323-324). Plaintiff reported she had had two interviews but the jobs had gone to someone else. Plaintiff said she was discouraged about not getting a job, but she was "still out there trying." Ms. Brunstrom went over plaintiff's past appointment schedule with Peggy Brothers, the nurse practitioner who saw her for mental health issues. Plaintiff was surprised at the number of times she had cancelled with Ms. Brothers (about half of her appointments had been cancelled), and Ms. Brunstrom asked plaintiff if she could make those appointments a priority in the future.

On August 5, 2011, caseworker Chelsea Brunstrom met with plaintiff (Tr. at 325-326). Plaintiff was excited about having gotten a job, and she said Job Point would assist her with cab fare and bus passes. Plaintiff had gotten frustrated with her children's father who was not coming for their child's birthday celebration.

On August 10, 2011, Peggy Brothers, a clinical nurse specialist, completed a Medical Assessment of Ability to do Work-Related Activities (Mental) which was signed by Dr. Parkinson as supervising physician on September 1, 2011 (Tr. at 228-229). Ms. Brothers had last seen plaintiff on April 21, 2011 -- four months earlier. Prior to that, Ms. Brothers had seen plaintiff on three occasions -- October 5, 2010; October 25, 2010; and February 17, 2011. Ms. Brothers found that plaintiff had a fair ability to do the following:

- Follow work rules
- Use judgment
- Function independently
- Understand, remember and carry out detailed but not complex job instructions
- Understand, remember and carry out simple job instructions
- Maintain personal appearance

She found that plaintiff's ability in the following areas was "poor or none:"

- Relate to co-workers
- Deal with the public
- Interact with supervisors
- Deal with work stresses
- Maintain attention/concentration
- Understand, remember and carry out complex job instructions
- Behave in an emotionally stable manner
- Relate predictably in social situations
- Demonstrate reliability

When asked to describe the medical/clinical findings supporting the assessment, Ms. Brothers wrote, "Dx [diagnosis] is PTSD and Major Depressive Disorder Recurrent; R/O

23

Bipolar Disorder."  When asked to state any other work-related activities which are affected by plaintiff's impairments, Ms. Brothers wrote:

> Client has suffered severe abuse in childhood as a result of the foster care system.  She has nightmares, flashbacks and mood problems now.  She is hypervigilent, irritable, easily agitated and doesn't trust others.  She [illegible] on things.  She has difficulty functioning around others.  Her mood is not stable.  At times is verbally aggressive.

On August 16, 2011, plaintiff was seen in the emergency room at University of Missouri Health System complaining of a migraine headache (Tr. at 334-344).  "Pt normally takes Maxalt tab up to three times a day, when she has migraine.  However, she did not take any of these today as she was coming to the ER.  The pain has subsided slightly since she has been in the ER."  Plaintiff was observed to be in no acute distress.  Her physical exam was normal.  She was cooperative with appropriate mood and affect and normal judgment.  She was given Ibuprofen and Maxalt following which her symptoms improved.  She was released to return to work that day.

On September 1, 2011, caseworker Chelsea Brunstrom spoke with plaintiff who said she had fallen at work and was off that day as a result (Tr. at 327-328).  Plaintiff was worried about her daughter not having gotten a spot in the Head Start day care program.  She had also been informed that she would not be able to schedule an appointment with Peggy Brothers because she had missed another appointment earlier that summer.

Later that day, plaintiff went to the emergency room at the University of Missouri Health System (Tr. at 345-360). Plaintiff said she was mopping and fell down six steps about four hours earlier.  She said this had occurred at home. "Pt decided after going to church function that her back was sore and kind of stiff and she needed to be seen in the ER."  She denied psychiatric symptoms (Tr. at 352).  Her physical exam was normal except tenderness in her neck and back.  Her psychiatric exam was normal: "Cooperative, appropriate mood & affect, normal judgment, non-suicidal."  X-rays of her spine were all normal.  She was given a

prescription for Flexeril (muscle relaxer) and Tramadol (narcotic-like pain reliever) and was released to return to work on September 4, 2011, with no restrictions.

On September 9, 2011, caseworker Chelsea Brunstrom spoke with plaintiff who said she had gone to the emergency room and was given muscle relaxers but was now much better and was back at work (Tr. at 328). Work was going well but her daughter still had not gotten a spot in the day care program. Ms. Brunstrom explained to plaintiff that the problem was that plaintiff's daughter did not have a disability so other children were more in need of the day care spots.

On September 27, 2011, plaintiff saw Beth Brandon, a nurse practitioner in Dr. Barba's office, for a condition unrelated to her alleged disability (Tr. at 279). Her physical exam was normal.

On October 7, 2011, caseworker Chelsea Brunstrom spoke to plaintiff about switching her from the caseworker program to a maintenance program and told her she would need to go through an NOS clinic in order to restart psychiatric services due to missing appointments (Tr. at 329). Plaintiff agreed with the new plan since she was working 8:00 to 4:30 which did not fit with a case management program.

On October 17, 2011, plaintiff saw Diane Spalding, a nurse practitioner in Dr. Barba's office, for a condition unrelated to her alleged disability (Tr. at 280-282). She did not report any mental symptoms and none were observed.

On November 28, 2011, plaintiff went to the emergency room at University of Missouri Health System (Tr. at 361-368). Plaintiff complained of a headache after having been exposed to carbon monoxide. Plaintiff denied psychiatric symptoms (Tr. at 366). Plaintiff's physical exam was normal. Her psychiatric exam was normal: "Cooperative, appropriate mood & affect, normal judgment." Plaintiff was told to follow up with her primary care doctor.

25

On December 5, 2011, plaintiff saw Elizabeth Geden, a nurse practitioner in Dr. Barba's office, for a condition unrelated to her alleged disability (Tr. at 283-286). Plaintiff denied depressed mood, diminished interest, diminished pleasure. No abnormal psychiatric symptoms were reported or observed.

On March 20, 2012, plaintiff saw Peggy Brothers, nurse practitioner (Tr. at 330-331). Plaintiff had not been taking any psychiatric medications. Plaintiff said she ran out of her medications because she could not get in to see Ms. Brothers and had been doing poorly since. She had lost her job as well due to having to call in sick because of her son's medical problems. Plaintiff said she had called Rainbow House, a shelter, to inquire about leaving her children there for a few days but she did not wind up doing that. She had been having crying spells, and her migraine headaches were worse. She reported thoughts of hurting others when they upset her. About three weeks earlier she had gotten physically aggressive with her sister. She reported feeling more depressed since she lost her job. She was having sleep problems. Plaintiff's grooming and hygiene were good. Her hair was styled. Her mood was irritable, anxious and depressed. Insight and judgment were fair. The rest of the mental status exam simply repeated plaintiff's subjective complaints. Lab work was ordered and plaintiff was put back on Celexa and Abilify.

On April 23, 2012, plaintiff went to the emergency room at University of Missouri Health System (Tr. at 369-381). She complained of swelling in her left foot. Her physical exam was normal except she had pain with range of motion in her foot. She was observed to be cooperative with appropriate mood and affect. Lab work showed a high level of uric acid. Her x-rays were normal. she was assessed with gout and was prescribed indomethacin (non-steroidal anti-inflammatory) as needed for pain and was told to taper off that once her symptoms start improving.

On April 24, 2012, plaintiff saw Peggy Brothers, nurse practitioner (Tr. at 332-333).

"Reports she is doing better now that she is on her medications. She started a job, actually worked full-time for a couple of weeks at hotel doing maid service and then got gout[7] in her both feet. She is currently on crutches. The doctors told her that would not be a good job for her, so she has had to quit. She reports outside of her bout with the gout she is doing pretty good and feeling pretty level headed." Plaintiff was not having very many nightmares, she denied depressed mood. Plaintiff reported getting angry easily. She agreed to restart therapy. Plaintiff was observed to have good grooming and hygiene. She showed some irritability but "calms down easily." Her flow of thought was logical and sequential. Speech was normal. She was continued on her same medications.

## V.    FINDINGS OF THE APPEALS COUNCIL

The Appeals Council entered its decision on August 27, 2013 (Tr. at 4-6). The opinion specifically adopted the ALJ's finding that plaintiff is not disabled (Tr. at 4). It agreed with the ALJ's findings under steps one, two and three of the sequential analysis (Tr. at 4). The Appeals Council disagreed with the ALJ's findings at step four because plaintiff's past work as a janitor

---

[7]"Gout is characterized by sudden, severe attacks of pain, redness and tenderness in joints, often the joint at the base of the big toe. Gout -- a complex form of arthritis -- can affect anyone. Men are more likely to get gout, but women become increasingly susceptible to gout after menopause. An acute attack of gout can wake you up in the middle of the night with the sensation that your big toe is on fire. The affected joint is hot, swollen and so tender that even the weight of the sheet on it may seem intolerable. Fortunately, gout is treatable, and there are ways to reduce the risk that gout will recur. . . . Gout occurs when urate crystals accumulate in your joint, causing the inflammation and intense pain of a gout attack. Urate crystals can form when you have high levels of uric acid in your blood. Your body produces uric acid when it breaks down purines -- substances that are found naturally in your body, as well as in certain foods, such as organ meats, anchovies, herring, asparagus and mushrooms. Normally, uric acid dissolves in your blood and passes through your kidneys into your urine. But sometimes your body either produces too much uric acid or your kidneys excrete too little uric acid. When this happens, uric acid can build up, forming sharp, needle-like urate crystals in a joint or surrounding tissue that cause pain, inflammation and swelling."
http://www.mayoclinic.org/diseases-conditions/gout/basics/definition/con-20019400

was not performed at the substantial gainful activity level (Tr. at 4-5). The Appeals Council

then found as follows:

> The claimant is 28 years old, which is defined as a younger individual, who has a high school education and who has no past relevant work. An individual with these vocational factors and with impairments which preclude understand[ing], remember[ing] and carry[ing] out up to complex work instructions, can relate appropriately with coworkers and supervisors, can tolerate usual changes to the work environment and can use judgment to make simple, work-related decision[s] (Decision, Finding 4) is found to be not disabled within the framework of section 204.00 of 20 CFR Part 404, Subpart P, Appendix 2. In this case, at the hearing the vocational expert identified the following jobs existing in significant numbers in the national economy: housekeeper (Dictionary of Occupational Titles (D.O.T.) 323.687-014,l which is light, unskilled); production bench assembly (D.O.T. 706.687-010, light unskilled), and hospital productions assembly (D.O.T. 712.687-010, light unskilled).

> In response to the Notice of Appeals Council Action dated June 26, 2013, the claimant's representative submitted the argument that the Administrative Law Judge failed to give adequate consideration to the opinion of the claimant's treating psychiatrist. However, the Appeals Council concludes that the Administrative Law Judge's consideration of the treating source opinion is appropriate.

> The Appeals Council considered the claimant's statements concerning the subjective complaints (Social Security Rule 96-7p) and adopts the Administrative Law Judge's conclusions in that regard.

(Tr. at 5).

The portion of the decision of Administrative Law Judge Robert Hodum which was

adopted by the Appeals Council is as follows:

Step one. Plaintiff has not engaged in substantial gainful activity since her alleged onset

date (Tr. at 14).

Step two. Plaintiff suffers from migraine headaches and affective disorder which are

severe impairments (Tr. at 14).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 14-

16).

Step four. Plaintiff retains the residual functional capacity to perform a full range of

work at all exertional levels but with the following nonexertional limitations: She can

28

understand, remember and carry out up to complex work instructions; she can relate appropriately to coworkers and supervisors; she can tolerate usual changes to the work environment; and she can use judgment to make simple, work-related decisions (Tr. at 16). Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment (Tr. at 17-19).

## VI.   PLAINTIFF'S RESIDUAL FUNCTIONAL CAPACITY

Plaintiff argues that the ALJ erred in assessing plaintiff's residual functional capacity because he gave too much weight to the opinion of non-treating, non-examining psychologist Mark Altomari, Ph.D., and not enough weight to the opinion of psychiatrist Kristen Parkinson, M.D. Although Dr. Parkinson signed a residual functional capacity assessment, she did so as supervising physician. There are no records showing that Dr. Parkinson ever saw plaintiff -- she simply approved the form completed by Nurse Peggy Brothers.

A claimant's residual functional capacity is the most that person can do despite his limitations. Toland v. Colvin, 761 F.3d 931, 934 (8th Cir. 2014); 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). An ALJ may discredit a claimant's subjective allegations of disabling symptoms to the extent they are inconsistent with the overall record as a whole including the objective medical evidence; medical opinion evidence; the claimant's daily activities; the duration, frequency, and intensity of the symptoms; the dosage, effectiveness, and side effects of medications and medical treatment; and the claimant's self-imposed restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984); 20 C.F.R. § 416.929; SSR 96-7p.

Social Security Ruling 06-3p clarifies how SSA considers opinions from sources who are not what the agency terms "acceptable medical sources." SSA separates information sources into two main groups: "acceptable medical sources" and "other sources." It then

29

divides "other sources" into two groups: medical sources and non-medical sources. 20 C.F.R. §§ 404.1502, 416.902 (2007). Acceptable medical sources include licensed physicians (medical or osteopathic doctors) and licensed or certified psychologists. 20 C.F.R. § § 404.1513(a), 416.913(a) (2007). According to Social Security regulations, there are major distinctions between acceptable medical sources and the others, including the fact that only acceptable medical sources can provide medical opinions. 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) (2007). Nurses fall within the category of "other sources," not medical sources. 20 C.F.R. §§ 404.1513(d), 416.913(d) (2007).

"Information from these 'other sources' cannot establish the existence of a medically determinable impairment," according to SSR 06-3p. Sloan v. Astrue, 499 F.3d 883, 888 (8th Cir. 2007). "Instead, there must be evidence from an 'acceptable medical source' for this purpose. However, information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." Id. quoting SSR 06-3p.

Although Dr. Parkinson signed the opinion several week after Nurse Brothers signed it, there is no evidence that Dr. Parkinson is a "treating" physician -- she never saw plaintiff, she never treated her beyond possibly signing prescriptions after plaintiff had seen Nurse Brothers. None of the medical records indicate that plaintiff ever saw Dr. Parkinson. Even assuming, however, that this opinion was prepared by a treating physician as opposed to a nurse, I find that the ALJ properly gave it little if any weight.

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005). If the ALJ fails

Case 2:13-cv-04216-REL   Document 19   Filed 11/06/14   Page 30 of 35

to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give the opinion including length of the treatment relationship and the frequency of examination; nature and extent of the treatment relationship; supportability, particularly by medical signs and laboratory findings; consistency with the record as a whole; and other factors, such as the amount of understanding of Social Security disability programs and their evidentiary requirements or the extent to which an acceptable medical source is familiar with the other information in the case record. 20 C.F.R. §§ 404.1527, 416.927.

The ALJ had this to say about the opinion approved by Dr. Parkinson:

On September 1, 2011, Kristen Parkinson, M.D., the claimant's treating psychiatrist opined that the claimant has poor to fair abilities to make occupational adjustments, making personal-social adjustments, and making performance adjustments. For example, Dr. Parkinson opined that the claimant has poor ability to interact with supervisors, deal with the public, maintain concentration and attention, and deal with work stressors. However, the claimant sang in the church choir and was seeking the assistance of Vocational Rehabilitation. She reported no problem with authority figures [and] was able to sustain concentration and attention to deal with work stressors at her most recent two positions. Dr. Parkinson opined that the claimant has [only] fair ability to maintain her appearance; however, the claimant appears at her appointments well groomed, with styled hair. Records from Burrell Mental Health show that in 2011, claimant was actively engaged in looking for a job and requesting advice about going on interviews. Claimant reported she would have accepted a job if her aunt could watch her children. In sum, Dr. Parkinson's treatment notes simply do not support the functional limitations she assessed in the medical source statement. Additionally, at the time of this opinion, Dr. Parkinson had not had an appointment with the claimant for more than six months and did not see the claimant for another appointment until six months later. For these reasons, the undersigned gives this opinion little weight.

(Tr. at 18-19).

The ALJ's reasoning is well founded. The medical evidence establishes that when plaintiff took her medication, her symptoms were well controlled. The evidence establishes that when plaintiff was working, her depression was diminished. In fact there is almost no evidence supporting a mental impairment much less a disabling mental impairment in this record.

31

On June 21, 2010, Dr. Barba noted that plaintiff's psychiatric exam was normal with no evidence of depression. On June 25, 2010, there were no mental symptoms alleged and no mental symptoms observed. On June 29, 2010, there were no mental symptoms alleged and no mental symptoms observed. On July 19, 2010, plaintiff alleged a host of mental symptoms; however, she denied depressed mood and had not been on any medications for "a while." Her psychiatric exam on this day was normal. On July 27, 2010, no mental symptoms were alleged or observed. On August 31, 2010, Dr. Barba noted that plaintiff was alert and oriented with no unusual anxiety and no evidence of depression. On September 21, 2010, plaintiff complained of irritability and other mental symptoms; however, Dr. Barba observed no evidence of depression. Despite that, she increased plaintiff's dose of Celexa and told her to exercise regularly.

On October 18, 2010, plaintiff saw Dr. Barba; no mental symptoms were alleged or observed. On January 25, 2011, plaintiff saw Dr. Barba; no mental symptoms were alleged or observed. On February 10, 2011, plaintiff saw nurse Brandon; no mental symptoms were alleged or observed. On February 17, 2011, plaintiff told Nurse Brothers that she wanted to stay on the same medications, that she felt the medications were working OK and that a lot of her stress was situational. On March 3, 2011, plaintiff said she had been in a pretty good mood and her irritability had not been too bad. On March 16, 2011, plaintiff reported doing alright. On March 17, 2011, plaintiff said she was doing alright. On March 30, 2011, plaintiff said she was doing OK. On April 6, 2011, plaintiff said she was doing pretty good. On April 15, 2011, plaintiff said she was doing OK, getting things done, seeing her boy friend, and singing in her church choir. On April 18, 2011, plaintiff said she was doing OK, she had performed with her church choir over the weekend, and was considering doing more solo performances. On April 20, 2011, plaintiff saw Dr. Barba; no mental symptoms were alleged

or observed.  On April 21, 2011, plaintiff said she was doing alright.  She said her mood had

been pretty good for the most part and that being busy helped her mood.  "If she's not busy she

states she gets depressed and irritable and picks at people verbally."  Plaintiff reported that

Abilify had been very helpful for her mood.

On April 29, 2011, plaintiff was feeling good and was planning to go out with her

friends.  Plaintiff reported her mood being OK on May 12, 2011, and on May 18, 2011.  On

June 24, 2011, plaintiff's psychiatric exam was normal.  On June 30, 2011, her psychiatric

exam was normal.  On September 1, 2011, plaintiff denied psychiatric symptoms and her

psychiatric exam was normal.

In the fall of 2011, plaintiff was able to work full time.  During that time, on September

1, 2011, she denied psychiatric symptoms, and on October 17, 2011, she denied psychiatric

symptoms.  She continued to deny psychiatric symptoms on November 28, 2011, and on that

day her psychiatric exam was normal.  On December 5, 2011, plaintiff denied psychiatric

symptoms and none were observed.

Plaintiff did not begin reporting psychiatric symptoms again until March 20, 2012 --

after she had lost her job and after she had stopped taking all of her psychiatric medications.

She reported feeling more depressed since she lost her job, and she lost her job due to taking

too much time off work for a reason unrelated to her alleged disability.  By a month later (after

having resumed her antidepressant medications) when plaintiff went to the emergency room

for her foot, she was observed to be cooperative with appropriate mood and affect.  She did not

report any psychiatric symptoms on that day.  The following day she reported doing better

since getting back on her antidepressant medications.  Plaintiff reported feeling "pretty good

and pretty level headed."  She denied depressed mood.  She was observed to show "some

Case 2:13-cv-04216-REL   Document 19   Filed 11/06/14   Page 33 of 35

irritability" but was not in counseling at the time and she was able to calm down quickly. The rest of her mental exam was normal.

Despite testifying about panic attacks multiple times per week, plaintiff did not seek medical attention for panic attacks, did not report panic attacks to her doctors, and specifically denied chest pain, irregular heart beat or palpitations (i.e., the symptoms she described as experiencing during a panic attack) on May 31, 2011, and June 30, 2011.

Although plaintiff argues that she testified she no longer attended church, her medical records establish that she continued to attend church functions as late as September 1, 2011 -- a full year after she applied for disability benefits. Plaintiff's caseworker through Burrell Behavioral Health consistently encouraged and assisted plaintiff in finding a job on March 1, 2011; March 3, 2011; March 16, 2011; March 17, 2011; April 6, 2011; April 15, 2011; April 18, 2011; April 21, 2011; April 28, 2011; May 12, 2011; June 16, 2011; July 22, 2011; and August 5, 2011. When plaintiff was working, her caseworker noted improvement in plaintiff's mood and outlook. The only time a mental impairment causing disability was discussed by the caseworker was after plaintiff said she could lose up to 25% of her temporary assistance money if she did not participate in the career center. The caseworker took plaintiff to talk to someone about preventing this. "Lori Dryer . . . explained that because client was enrolled in BBH services she could be exempt from the career center requirements. She explained that she needed a written letter stating that client was unable to fulfill her career center requirements due to mental health issues." At no other time did the caseworker even hint that plaintiff should not be looking for a job or working due to a mental impairment or for any other reason.

I have reviewed plaintiff's other arguments and find them to be without merit. The residual functional capacity as assessed by the ALJ and adopted by the Appeals Council is supported by substantial credible evidence in the record.

34

VII.    CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding and the Appeals Council's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
November 5, 2014